PEOPLE v KNOX

Docket No. 226944. Submitted August 7, 2002, at Grand Rapids. Decided
April 8, 2003, at 9:05 A.M. Leave to appeal sought.

Danny L. Knox, Jr., was convicted by a jury in the Kalamazoo Circuit
Court, J. Richardson Johnson, J., of first-degree felony murder,
with first-degree child abuse as the predicate felony, for commit-
ting the abuse from which his child died. The defendant appealed,
alleging error in the admission of evidence that the defendant had
an anger-management problem, that the child had suffered abuse
before the night the fatal injuries were inflicted, and that the child's
mother was a good parent who would not have committed the
crime. The defendant also alleged that he cannot be convicted of
felony murder when the acts comprising the predicate felony also
comprised the murder.

The Court of Appeals *held*:

1. The defendant failed to object to the admission of the evi-
dence pertaining to his anger-management problem, the past abuse
of the child, and the good character of the child's mother, and,
thus, failed to preserve the issues for appellate review. Therefore,
the defendant is entitled to relief only if he demonstrates plain
error affecting his substantial rights, i.e., he was actually innocent
or the error seriously affected the fairness, integrity, or public rep-
utation of the judicial proceedings independent of the defendant's
innocence.

2. Appellate courts must look at the evidence in a light most
favorable to the prosecution to determine whether it was an abuse
of discretion to admit prior-bad-acts evidence. The appellate courts
must determine that the evidence was prejudicial—not harmless—
when viewing the evidence as a whole in a light most favorable to
the prosecution.

3. Although the prosecution never articulated a proper purpose
for the evidence regarding the defendant's anger-management prob-
lem, this failure is not a bar to considering whether the evidence
was admissible. The evidence was relevant and admissible to estab-
lish the common scheme, plan, or system of the defendant in per-
petrating a particular type of physical assault. Even if the trial
court erred in allowing this evidence, the error was neither clear

nor obvious, and was not plain error. The evidence was not so unfair that it substantially outweighed the probative value of the prior-bad-acts evidence. The evidence was properly admitted.

4. Evidence of prior injuries to the victim of first-degree child abuse is relevant, when offered to show that certain injuries are a product of child abuse rather than an accident, even though the evidence does not purport to prove the identity of the person who might have inflicted those injuries. Here, there was no unfair prejudice that outweighed the value of the evidence, which was probative of whether the child's injuries were inflicted intentionally.

5. The evidence regarding the good character of the mother of the child was improper character evidence and did not serve one of the noncharacter purposes articulated in MRE 404(b). It was plain error to admit such evidence. However, the error did not prejudice the defendant's substantial rights and affect the outcome of the trial.

6. Even if the defendant's trial counsel provided ineffective assistance in failing to object to the admission of the evidence, the error in admitting the evidence was insufficiently prejudicial to justify reversal of an otherwise valid conviction on the basis of ineffective assistance of counsel.

7. The defendant's argument regarding whether he can be convicted of felony murder, where the murder and the predicate felony both arose out of the same act, is without merit because the jury found that the defendant possessed both the malice to commit murder and the intent necessary to commit first-degree child abuse. The felony-murder statute serves to raise an established murder to first-degree murder and makes no distinctions for the commission of enumerated felonies with assaultive intent against the murder victim.

Affirmed.

BANDSTRA, J., dissenting in part, stated that the trial court erred in finding that the prior-bad-acts evidence was admissible. The defendant demonstrated that the admission of this evidence was not harmless and that it affected the outcome of the trial. There is merit to the claim of ineffective assistance of counsel. The conviction should be reversed and the matter should be remanded for a new trial.

1. EVIDENCE — PRIOR BAD ACTS — APPEAL.

Appellate courts must look at the evidence in a light most favorable to the prosecution in determining if the trial court abused its discretion in admitting prior-bad-acts evidence; appellate courts must determine that the improper admission of such evidence was preju-

dicial, not harmless error, while viewing the evidence as a whole in a light most favorable to the prosecution (MRE 404[b]).

2. EVIDENCE — PRIOR BAD ACTS — APPEAL.
   A defendant who fails to preserve for appellate review the alleged erroneous admission of prior-bad-acts evidence must demonstrate plain error affecting substantial rights, i.e., he was actually innocent or the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of the defendant's innocence, before the defendant may be afforded relief.

3. EVIDENCE — FIRST-DEGREE CHILD ABUSE — PRIOR INJURIES TO VICTIM.
   Evidence of prior injuries to the victim of first-degree child abuse is relevant, when offered to show that certain injuries are the product of child abuse rather than an accident, even though the evidence does not purport to prove the identity of the person who might have inflicted the injuries (MRE 404[b]; MCL 750.136b[2]).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *James J. Gregart*, Prosecuting Attorney, and *Judith B. Ketchum*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Gary L. Rogers*) for the defendant on appeal.

Before: WHITBECK, C.J., and BANDSTRA and TALBOT, JJ.

WHITBECK, C.J. After a first jury trial resulted in a hung jury, a second jury convicted defendant Danny Lee Knox, Jr., of first-degree felony murder,[1] with first-degree child abuse as the predicate felony, for committing the abuse from which his four-month-old son, Xavier Knox, died. The trial court sentenced Knox to life imprisonment without the possibility of parole. Knox appeals as of right. We affirm.

---

[1] MCL 750.316(1)(b).

I. BASIC FACTS AND PROCEDURAL HISTORY

On the evening of July 22, 1998, LaToya Kelley and Knox, Xavier Knox's parents, were in Kelley's apartment with the baby and Kelley's two-year-old child. It is undisputed that, during the evening, the couple argued. Later in the evening, Kelley fed the baby a bottle of formula before putting him to bed. At that time, the baby seemed fine to Knox.

After the baby went to sleep, Kelley left her apartment to get a cigarette from Latarsha Ferguson, a friend and neighbor. Kelley was still upset with Knox when she left the apartment sometime between 9:30 P.M. and 9:35 P.M. When Kelley arrived at Ferguson's apartment moments later, Ferguson was busy and told Kelley to return in a few minutes. Kelley then went to neighbor Avery Evans's apartment.

According to Knox, he checked on the baby and Kelley's other child at around 9:45 P.M., at which time he sent the older child to the bathroom. A few minutes later, after the child was finished in the bathroom, Knox reentered the bedroom that the children shared. Knox noticed the baby making gurgling noises and saw that the baby's eyes had rolled back into his head. He tried, but failed, to get the baby to respond to him, so he ran to the balcony and yelled for Kelley. He then telephoned Kelley's mother, telling her that something was wrong. Kelley's mother later testified that she received this telephone call at 10:00 P.M.

After calling Kelley's mother, Knox said that he ran to neighbor Roberta Cruz's apartment. He was looking for Kelley and was concerned that the baby was not breathing. Cruz telephoned 911 within seconds of Knox's arrival. Emergency-service personnel arrived

at the apartment at 10:16 P.M. The baby had a heart-beat at that time. At 10:25 P.M., on reassessment, the baby no longer had a heartbeat. Neither Cruz nor any of the responding emergency personnel saw any signs that the baby had been abused. Only after the baby arrived in the emergency room did the signs and extent of the abuse become apparent.

Medical experts determined that the baby died as the result of being shaken severely. During the shaking incident, his head came into contact with an object between three and seven times. Experts concluded that the baby likely would have lost consciousness within one or two minutes of being injured. Other physical symptoms would have manifested themselves within two minutes. He would not have cried normally in response to his injuries, but may have moaned. One medical expert believed that it was possible that the baby could have continued to breathe in an abnormal pattern for one or two hours before his heart rate collapsed. The pathologist who performed the autopsy thought, however, that the baby could have breathed spontaneously for only minutes after the injury was inflicted.[2] Both experts agreed that it would have been impossible for the baby to consume a bottle at 9:00 P.M., which is when Kelley estimated she fed the baby the bottle, if he had been beaten before that time.

The baby's specific injuries included retinal hemorrhaging or bleeding in the eyes, a sign of shaken-baby syndrome. The baby had three distinct skull fractures, which were fatal and caused by three separate

---

[2] This testimony was contradicted by the facts. The evidence demonstrated that the victim still had a heartbeat when the emergency-service personnel arrived at 10:16 P.M.

impacts. The baby had also recently sustained an
injury to his liver and fractures to his right arm and
left leg. In addition, the baby had healed rib fractures
that were between three- and six-weeks old. Finally,
the baby had seven crescent-shaped marks on the
exterior of his head, which were caused either by fin-
gernails or by the baby's head coming into contact
with a rough surface. The experts concluded that the
injuries inflicted on the baby were not accidental.

At trial, Knox attempted to show that Kelley abused
the baby before leaving the apartment on the evening
in question. Knox categorically denied that he was
responsible for the baby's death. Conversely, the pros-
ecutor sought to establish that Knox had problems
bonding with the baby. The prosecution also elicited
testimony that Knox had problems with anger man-
agement, including separate incidents when he had
pushed Kelley, kicked his foot through a door, and
punched his hand through a wall. Kelley said that
Knox was taking anger-management classes. Knox
said that he was taking a parenting class, not an
anger-management class, though he admitted on
cross-examination that Kelley told him to get help
with his anger and that the class was designed to
"clear the air" with Kelley. The prosecution also elic-
ited testimony that the baby had suffered abuse
before the night he died.

## II. ARGUMENTS

On appeal, Knox raises two critical issues. First, he
argues that the trial court committed error requiring
reversal when it admitted evidence that he had an
anger-management problem, that the baby had suf-
fered abuse before the night the fatal injuries were

inflicted, and that Kelley was a good parent who would not have committed the crime. Though Knox phrases his argument in terms of prosecutorial misconduct, this is in actuality an evidentiary issue, and we examine the substance of his arguments in that context. Second, Knox argues that he cannot be convicted of felony murder when the acts comprising the predicate felony also comprised the murder.

### III. PRIOR-BAD-ACTS EVIDENCE

#### A. STANDARD OF REVIEW

Because Knox did not object when the trial court admitted the evidence pertaining to his anger-management problem, the past abuse of the baby, and Kelley's good character, he failed to preserve this issue for appeal.[3] Accordingly, Knox is entitled to relief only if he demonstrates plain error affecting his substantial rights, meaning that he was actually innocent or the error " ' "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings" independent of' " Knox's innocence.[4]

#### B. INTERPRETATIONS OF MRE 404(b)

MRE 404(b) provides, in part:

(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in

---

[3] See *People v Carines*, 460 Mich 750, 761; 597 NW2d 130 (1999).

[4] *Id.* at 763, quoting *United States v Olano*, 507 US 725, 736; 113 S Ct 1170; 123 L Ed 2d 508 (1993).

doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

In *People v VanderVliet*,[5] the Michigan Supreme Court, relying on *Huddleston v United States*,[6] set out the three factors that must be present for prior-bad-acts evidence[7] to be admissible. First, the evidence must "be offered for a proper purpose under Rule 404(b)."[8] Second, the evidence must "be relevant under Rule 402 as enforced through Rule 104(b)."[9] And third, "the probative value of the evidence [must not be] substantially outweighed by unfair prejudice."[10] Additionally, if the trial court admits the evidence, "the trial court may, upon request, provide a limiting instruction to the jury."[11]

The Supreme Court utilized this "flexible"[12] test in *People v Crawford*,[13] explaining that

[u]nder this formulation, the prosecution bears the initial burden of establishing relevance of the evidence to prove a fact within one of the exceptions to the general exclusionary rule of MRE 404(b). Where the only relevance is to character or the defendant's propensity to commit the

---

[5] *People v VanderVliet*, 444 Mich 52; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).

[6] See *VanderVliet, supra* at 55 n 2, citing *Huddleston v United States*, 485 US 681; 108 S Ct 1496; 99 L Ed 2d 771 (1988).

[7] Appellate opinions use the terms "prior-bad-acts evidence" and "other-acts evidence" interchangeably.

[8] *VanderVliet, supra* at 55.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *People v Sabin (After Remand)*, 463 Mich 43, 58; 614 NW2d 888 (2000).

[13] *People v Crawford*, 458 Mich 376; 582 NW2d 785 (1998).

crime, the evidence must be excluded. Where, however, the evidence also tends to prove some fact other than character, admissibility depends upon whether its probative value outweighs its prejudicial effect, taking into account the efficacy of a limiting instruction in cushioning the prejudicial effect of the evidence.[14]

Though a prosecutor may articulate a proper purpose for the evidence even after trial,[15] a prosecutor may not merely list one of the proper purposes articulated in MRE 404(b) to make the evidence admissible.[16] Rather, relevance is critical.[17]

> Relevance is a relationship between the evidence and a material fact at issue that must be demonstrated by reasonable inferences that make a material fact at issue more probable or less probable than it would be without the evidence. . . . The logical relationship between the proffered evidence and the ultimate fact sought to be proven must be closely scrutinized.[18]

In other words, the evidence "truly must be probative of something *other* than the defendant's propensity to commit the crime."[19] Even though MRE 404(b) is "inclusionary,"[20] the Supreme Court has explained, "[i]f the prosecutor fails to weave a logical thread linking the prior act to the ultimate inference, the evidence must be excluded . . . ."[21]

---

[14] *Id.* at 385.

[15] See *Sabin (After Remand), supra* at 59 n 6.

[16] *Crawford, supra* at 387.

[17] *Id.*

[18] *Id.* at 387-388 (citation omitted).

[19] *Id.* at 390.

[20] See *People v Engelman,* 434 Mich 204, 213; 453 NW2d 656 (1990).

[21] *Crawford, supra* at 390.

C. *HINE*

After the parties submitted their briefs and engaged in oral arguments, the Michigan Supreme Court decided *People v Hine*.[22] Because we believe that *Hine* controls the outcome of this case, we discuss it in some detail.

The prosecutor in *Hine* brought charges against defendant Robert Hine after toddler Caitlin McLaughlin died.[23] Hine lived with the little girl and her mother, who was his girlfriend.[24] In the week preceding her death, Hine had taken care of the child while his girlfriend was at work, thus having a number of occasions to be alone with the little girl.[25] The authorities, when they conducted an autopsy, learned of numerous injuries the little girl had sustained, including

> several internal injuries including a subdural hematoma, a healing tear of the liver, hemorrhage in the region of the pancreas, another area of bleeding in the colon (near the appendix), and a large amount of fluid in the abdomen. Caitlin [McLaughlin] had numerous circular bruises on her abdomen and a bruise across the bridge of her nose. The injuries were of varying ages, from less than half a dozen hours up to five to seven days old. The cause of death was multiple blunt force injuries. The pathologist opined that the aggregate of the injuries caused [Caitlin McLaughlin's] death, and that the death was not accidental.[26]

---

[22] *People v Hine*, 467 Mich 242; 650 NW2d 659 (2002).

[23] *Id.* at 245.

[24] *Id.* at 247.

[25] *Id.* at 245.

[26] *Id.* at 244-245.

Before trial in *Hine*, the prosecutor asked the trial court to permit prior-bad-acts testimony from three witnesses to be admitted in evidence at trial.[27] Two of these witnesses had dated Hine in the past and the third witness was Caitlin McLaughlin's mother, who had also dated Hine.[28] The prosecutor proposed to have each of these witnesses testify regarding past incidents in which Hine had allegedly physically abused the women,[29] arguing that the testimony was admissible as evidence of a "common scheme, plan, or system."[30] The trial court, considering that two of the women described certain injuries Hine allegedly inflicted on their mouths and that the third woman described a head-butting incident,[31] agreed with the prosecutor that the evidence was admissible.[32] The trial court, the Supreme Court later explained, reasoned that the testimony "was not being offered to show [Hine's] propensity to commit the criminal act" against the child.[33] "Rather, the other acts evidence was offered to show defendant's scheme, intent, system, or plan in committing the acts and to show the lack of accident."[34] In particular, as the Supreme Court later characterized the trial court's decision, the trial court thought that the evidence was relevant to demonstrating who had injured Caitlin McLaughlin and the perpetrator's intent.[35] Finding the evidence

---

[27] *Id.* at 245-246.

[28] *Id.* at 245.

[29] *Id.* at 246-248.

[30] *Id.* at 246.

[31] *Id.* at 246-248.

[32] *Id.* at 248.

[33] *Id.*

[34] *Id.*

[35] *Id.*

probative, the Supreme Court said, the trial court rec-
ognized "the danger of unfair prejudice, but held that
the prejudice was diminished because the other acts
evidence involved women, not children, and the
women gave no testimony about the defendant harm-
ing children."[36]

At trial, the women detailed their alleged abuse at
Hine's hands. According to one of Hine's former girl-
friends, Hine had "grabbed her arms, put his hands in
her mouth, and stretched her lips."[37] This left her with
"bruises on her gums."[38] She "attributed the violence
to [Hine's] irritation with her," and also detailed other
threats and black eyes he allegedly inflicted on her.[39]
Hine's other former girlfriend claimed that he
assaulted her "at least once a week" while they were
dating.[40] She described Hine's acts of picking her up
and throwing her and using his head to strike her
nose, and said that Hine had also grabbed and shoved
her.[41] Caitlan McLaughlin's mother said that Hine had
"pin[ned] down her arms with his knees when he was
angry, causing bruises on her arms."[42] She said Hine
also injured her mouth with what she described as a
" 'fish-hook' " motion, in which he used his fingers to
stretch her mouth.[43]

After the jury convicted Hine of felony murder and
first-degree child abuse, he appealed.[44] The case then

---

[36] *Id.*
[37] *Id.* at 246.
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.* at 247.
[43] *Id.*
[44] *Id.* at 249.

took a lengthy tour of the Michigan appellate courts. A panel of this Court first reversed Hine's convictions.[45] When the prosecutor succeeded in having this Court's decision reversed and the matter remanded back to this Court, partly on the basis of the Supreme Court's new opinion in *People v Sabin (After Remand)*,[46] this Court again reversed Hine's convictions.[47] The prosecutor again appealed.[48] The Supreme Court then ruled on whether the trial court had erred in admitting the prior-bad-acts evidence, stating:

> The Court of Appeals erred in its determination that evidence of defendant's assaultive behavior toward three women was inadmissible under *Sabin*. We hold that the evidence was admissible to establish the common scheme, plan, or system of the defendant in perpetrating a particular type of physical assault. From that evidence the jury could properly have inferred that the charged acts were committed, and were committed by the defendant.[49]

In sum, this Court twice concluded that the trial court actually appeared to admit the evidence on the one basis that it was inadmissible: its value in demonstrating that Hine was prone to violence, had acted in accordance with that propensity, and thus must have killed the little girl.[50] Rather obviously, the Supreme Court disagreed with this Court's conclusions in

---

[45] *Id.* at 243; see also *People v Hine*, unpublished opinion per curiam of the Court of Appeals, issued February 25, 2000 (Docket No. 207358) (hereinafter *Unpublished Hine I*).

[46] *Sabin (After Remand)*, *supra* at 58.

[47] *Hine*, *supra* at 243-244, 250.

[48] *Id.* at 244.

[49] *Id.* at 244.

[50] See *Unpublished Hine I*, *supra*; *People v Hine (On Remand)*, unpublished opinion per curiam of the Court of Appeals, issued November 13, 2001 (Docket No. 207358).

*Hine.* Equally obviously, the Supreme Court's decision binds us.[51] The question, of course, is what does the Supreme Court's *Hine* decision obligate us to do? We believe that, as is relevant to this case,[52] the Supreme Court's opinion in *Hine* presents a formidable obstacle to reversing on the basis of a trial court's error in admitting prior-bad-acts evidence. That obstacle certainly looms large in cases such as this one, in which the party claiming error has failed to preserve the issue for appeal and thus must demonstrate plain error affecting a substantial right before being afforded relief.[53] If the abuse-of-discretion standard of review makes a trial court's decision on a close evidentiary matter virtually beyond review,[54] then it is hardly possible that an evidentiary matter that presents a close call will ever constitute an error that is sufficiently "clear or obvious" to satisfy the plain-error standard.[55]

We draw this conclusion because, in a succession of decisions culminating in *Hine*, the Supreme Court has, in our view, reduced the value parties opposing prior-bad-acts evidence once derived from the first

---

[51] See *People v Beasley*, 239 Mich App 548, 556; 609 NW2d 581 (2000).

[52] The Supreme Court in *Hine* emphasized the abuse-of-discretion standard of review it had explained to a limited extent in *People v Bahoda*, 448 Mich 261; 531 NW2d 659 (1995). See *Hine, supra* at 250, 253. This standard of review is irrelevant to this issue in this case because Knox did not ask the trial court to rule on the admissibility of the evidence by objecting. Therefore, the trial court did not consciously exercise its discretion, leaving us to apply the plain-error doctrine embodied in MRE 103(d) and explained in *Carines, supra.*

[53] See *Carines, supra* at 763-764.

[54] See *Bahoda, supra* at 289, quoting *People v Golochowicz*, 413 Mich 298, 322; 319 NW2d 518 (1982).

[55] *Carines, supra* at 763.

and third prongs[56] of the *VanderVliet* test. For
instance, consistent with *VanderVliet's* first prong,
*Crawford* mandated that prosecutors "articulat[e] a
proper noncharacter purpose" for the prior-bad-acts
evidence.[57] By doing this, prosecutors provide the
trial court with a proper theory of relevance,[58] and
therefore give the trial court the most complete basis
on which to determine whether the evidence is
admissible for a noncharacter reason or inadmissible
as propensity evidence.[59] However, in *Sabin*, the
major case concerning MRE 404(b) preceding *Hine*,
the Supreme Court reversed this interpretation of
MRE 404(b), permitting prosecutors to articulate a
proper purpose for the evidence at any time, whether
at trial or on appeal.[60] In fact, read closely, *Sabin*
does not explicitly require prosecutors ever to articu-
late a purpose for the evidence at trial that is actually
proper, because "[t]he prosecution's recitation of pur-
poses at trial does not restrict appellate courts in
reviewing a trial court's decision to admit the evi-
dence."[61] The Supreme Court relied on this standard
in *Hine* when it looked at what could be described as
the prosecutor's "[m]echanical recitation"[62] of proper

---

[56] See *VanderVliet, supra* at 55 (first prong requires proper purpose,
second prong requires logical relevance, third prong entails prejudice
analysis).

[57] See *Crawford, supra* at 386 n 6.

[58] To a limited extent, the articulation requirement also helps the trial
court choose the appropriate logical-relevance analysis when the evidence
is intended to prove identity through modus operandi. See *VanderVliet,
supra* at 67.

[59] See *Crawford, supra* at 386 n 6; see also *Sabin (After Remand),
supra* at 59 n 6; *VanderVliet, supra* at 89, as amended 445 Mich 1205.

[60] See *Sabin (After Remand), supra* at 59 n 6; see also *Sabin (After
Remand), supra* at 76 (CAVANAGH, J., dissenting).

[61] *Sabin (After Remand), supra* at 59 n 6.

[62] See *Crawford, supra* at 387-388.

purposes for the prior-bad-acts evidence and then constructed a theory of admissibility it could endorse.[63]

While the Supreme Court spent a number of years debating *VanderVliet's* first prong,[64] it has acted swiftly with respect to *VanderVliet's* third prong, which compares the probative value of evidence with any unfair prejudice it might cause if admitted.[65] MRE 403 acts as a safety valve; it allows courts to exclude evidence that technically fits *VanderVliet's* first two prongs, but nevertheless poses a distinctly unfair and real danger of allowing the jury to convict on the basis of a propensity theory, rather than the proper and logically relevant purpose for which the evidence is being offered.[66] As *VanderVliet* says:

> Other acts evidence is not admissible simply because it does not violate Rule 404(b). Rather, a "determination must be made whether the danger of undue prejudice [substantially] outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision[s] of this kind under Rule 403."[67]

The Supreme Court has continued to subscribe to *VanderVliet's* third prong as recently as its *Sabin* decision[68] and, in fact, quoted *VanderVliet* in

---

[63] See *Hine, supra* at 245-246; *Unpublished Hine I, supra.*

[64] See *Sabin (After Remand), supra* at 59 n 6, responding to *Crawford, supra* at 386 n 6.

[65] See MRE 403.

[66] See *VanderVliet, supra* at 72-73, 75; see also *People v Starr,* 457 Mich 490, 496, 500; 577 NW2d 673 (1998); *People v Mills,* 450 Mich 61, 74-75; 537 NW2d 909 (1995), mod on other grounds 450 Mich 1212 (1995).

[67] *VanderVliet, supra* at 75, quoting 28 USCA, p 196, advisory committee notes to FRE 404(b).

[68] See *Sabin (After Remand), supra* at 57-58.

*Hine.*[69] Nevertheless, MRE 403 played no role in the Supreme Court's decision in *Hine.* In *Hine,* the Supreme Court's analysis stopped after it determined that the evidence was relevant to a nonpropensity theory.[70] The Supreme Court in *Hine* therefore concluded that the prior-bad-acts evidence was relevant and admissible without analyzing whether the evidence was substantially more unfairly prejudicial than probative.[71] This is something of a departure from *VanderVliet.*

The Supreme Court's reasoning concerning the second prong of *VanderVliet* is equally critical. In our view, *Hine* restricts the ability of appellate courts to engage in an examination of the logic linking the prior-bad-acts evidence to a theory of relevance, as *VanderVliet's* second prong seemingly requires.[72] Logical relevance is important because it "ensure[s] the defendant's right to a fair trial . . . ."[73] Before *Hine,* the Supreme Court described logical relevance as a matter that "must be closely scrutinized"[74] because it is a "touchstone" for admissibility.[75] However, the Supreme Court in *Hine* indicated that appellate courts "are required" to look at the "evidence in a light most favorable to the prosecution" to determine whether it was an abuse of discretion to admit the prior-bad-acts evidence.[76] The Supreme Court made

---

[69] See *Hine, supra* at 247-248.

[70] See *Hine, supra* at 253; compare *Starr, supra* at 500-503 (engaging in full *VanderVliet* analysis).

[71] See *Hine, supra* at 244.

[72] See *Crawford, supra* at 390.

[73] *Id.* at 388.

[74] *Id.*

[75] *Starr, supra* at 497.

[76] See *Hine, supra* at 251.

this statement, apparently, as if the case involved a question concerning the sufficiency of the evidence[77] or a directed verdict,[78] the contexts in which courts frequently apply this standard in criminal cases.[79]

We note that the Supreme Court did not explain how viewing the evidence in the light most favorable to the prosecutor in every case involving prior-bad-acts evidence would comport with the harmless-error test it delineated in *People v Lukity*.[80] *Lukity* requires courts to look at evidence admitted erroneously in light of all the evidence properly on the record.[81] *Lukity* does not set out, at least in our view, a method for evaluating the evidence.

The Supreme Court in *Hine* relied heavily on similarity as proof of logical relevance. However, the Supreme Court also, rather abruptly, stated that "distinctive and unusual features are not required to establish the existence of a common design or plan."[82] We note that in *People v Golochowicz*,[83] the Supreme Court explained that when

the only conceivable justification for admission of such similar-acts evidence is to prove the identity of the perpetrator, the link is forged with sufficient strength to justify admis-

---

[77] See *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992); *People v Petrella*, 424 Mich 221, 268; 380 NW2d 11 (1985).

[78] See *People v Aldrich*, 246 Mich App 101, 122; 631 NW2d 67 (2001).

[79] Indeed, our research has not revealed another published opinion—other than *Hine*—that examined the "evidence in a light most favorable to the prosecution" when analyzing whether the decision to admit or exclude evidence of any kind was an abuse of discretion.

[80] *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999).

[81] See *id.* at 495, quoting *People v Mateo*, 453 Mich 203, 211; 551 NW2d 891 (1996).

[82] *Hine, supra* at 252-253.

[83] *People v Golochowicz*, 413 Mich 298; 319 NW2d 518 (1982).

sion of evidence of the separate offense only where the cir-
cumstances and manner in which the two crimes were com-
mitted are "[s]o nearly identical in method as to earmark
[the charged offense] as the handiwork of the accused.
Here much more is demanded than the mere repeated com-
mission of crimes of the same class, such as repeated bur-
glaries or thefts. The [commonality of circumstances] must
be so unusual and distinctive as to be like a signature."[84]

Some courts have misinterpreted *Golochowicz* to
mean that there must be this high degree of similarity
between the charged offense at issue and the prior-
bad-acts evidence for the prior-bad-acts evidence to
be admissible, irrespective of the prosecutor's theory
of admissibility.[85] However, *VanderVliet* commented
that "*Golochowicz* identifies the requirements of logi-
cal relevance when the proponent is utilizing a *modus
operandi theory* to prove *identity.*"[86] In *Sabin*, the
Supreme Court expanded the use of similar-prior-bad-
acts evidence, holding that "similar misconduct is *log-
ically relevant to show that the charged act occurred*
where the uncharged misconduct and the charged
offense are sufficiently similar to support an infer-
ence that they are manifestations of a common plan,
scheme, or system."[87] The *Sabin* Court adopted an
intermediate level of similarity between the charged
offense and prior-bad-acts evidence introduced under
this common plan, scheme, or system theory, which
must be more than the similarity required to prove

---

[84] *Id.* at 310-311, quoting McCormick, Evidence (2d ed), § 190, p 449
(alterations in *Golochowicz*).

[85] See *VanderVliet, supra* at 67 n 17.

[86] *Id.* at 66.

[87] *Sabin (After Remand), supra* at 63 (emphasis added).

intent but may be less than the similarity necessary to prove identity.[88]

When the Supreme Court applied *Sabin* to *Hine*, it commented that this Court required a "high degree of similarity between the other acts and the charged acts . . . ."[89] The Supreme Court said that the evidence that Hine had abused his girlfriends was logically relevant to proving that the little girl "had died from multiple, nonaccidental, blunt force injuries, and that her death was a homicide."[90] The Supreme Court's analysis suggests that the true value of the prior-bad-acts evidence was in showing that "*the defendant* [Hine] employed the common plan in committing the charged offense."[91] In other words, the prior-bad-acts evidence was useful because it proved the identity of the person who killed the child. In our view, the Supreme Court here effectively merged the common plan, scheme, or system theories for admissibility into the traditional identity by modus operandi theory, but did so in a way that lowered the degree of similarity that the prosecutor had to demonstrate between the charged and uncharged acts Hine allegedly committed. Further, the Supreme Court focused much of its analysis on the way the prior-bad-acts evidence revealed Hine's *intent* to harm the little girl, excluding any possibility that the child died from accidental injuries rather than as a victim of a homicide.[92]

We make these observations about *Hine* in an attempt to ascertain the direction in which Supreme

---

[88] *Id.* at 65.

[89] *Hine, supra* at 252.

[90] *Id.*

[91] *Id.* at 253 (emphasis added).

[92] *Id.* at 252.

Court precedent is moving. In view of the language in *Hine*, we gather that the Supreme Court wishes courts to continue to use *VanderVliet's* framework, with the flexibility inherent in that analysis favoring admission of prior-bad-acts evidence. Further, however, the Supreme Court said in *Hine* that this Court must look at the evidence in the light most favorable to the prosecutor. Accordingly, if a trial court in a criminal trial admits prior-bad-acts evidence, we must determine that the evidence was prejudicial—not harmless—when viewing the evidence as a whole in a light most favorable to the prosecution. With this in mind, we turn to the facts and arguments concerning this case.

### D. ANGER AND PAST ABUSE AGAINST KELLEY

Knox contends that the prosecutor improperly introduced evidence that he had an anger problem, which he manifested by breaking objects, damaging Kelley's apartment, and physically abusing Kelley, all of which resulted in Kelley's ultimatum that he attend anger-management classes or move out of her apartment. The record reveals that this evidence was pervasive at trial. The prosecutor has never articulated a proper purpose for the evidence concerning Knox's anger, as *VanderVliet* requires.[93] However, *Sabin* informs us that the prosecutor's failure in this regard is not a bar to considering whether the evidence was admissible.[94]

The next question under *VanderVliet* is whether the anger evidence was logically relevant to a matter at

---

[93] See *VanderVliet, supra* at 55.

[94] See *Sabin (After Remand), supra* at 59 n 6.

issue at trial.[95] Without an argument regarding the
proper purpose of the evidence, logical relevance is a
difficult matter to address. However, the facts of this
case are markedly similar to the facts in *Hine*. In
both cases, the defendant was alone with the victim
in the time preceding the victim's death. Both victims
showed physical injuries that could be considered evi-
dence of abuse. Neither defendant was married to the
victim's mother. Most importantly, both defendants
had a history of abusing adult women, but no explicit
history of perpetrating violence against children.
There also is a direct parallel between the way Kelley
characterized Knox's abuse here as part of a pattern
of anger-management problems and the way one of
Hine's former girlfriends placed his violent conduct in
the context of his irritation with her. The Supreme
Court in *Hine* concluded that this evidence was rele-
vant and "admissible to establish the common
scheme, plan, or system of the defendant in perpetrat-
ing a particular type of physical assault."[96] Given the
Supreme Court's determination that this evidence was
sufficiently relevant to these proper bases for admis-
sion, we cannot say that the highly similar evidence
concerning Knox's anger and abuse against Kelley
failed *VanderVliet's* purpose or relevance prongs.[97]

In other words, the similarity between these two
cases means that, even if the trial court erred in
allowing the jury to hear this evidence, the error was
neither "clear" nor "obvious," but would revolve
around subtle distinctions that cannot be character-

[95] See *VanderVliet, supra* at 55.

[96] *Hine, supra* at 244.

[97] *VanderVliet, supra* at 55.

ized as "plain."[98] Additionally, with respect to the unfair-prejudice prong of *VanderVliet*,[99] the prejudice flowing from this evidence is obvious. Most evidence a party—in this case the prosecutor—introduces causes some prejudice. That simply is the nature of evidence introduced in a trial.[100] However, the evidence here was not so unfair that it substantially outweighed the probative value of the prior-bad-acts evidence. We therefore conclude, under *Hine*, that this evidence was properly admitted.

### E. PAST ABUSE OF THE CHILD

Knox argues that the prosecutor once again presented improper prior-bad-acts evidence to the jury in eliciting evidence that the baby suffered injuries even before the fatal incident. The prosecutor contends that this evidence was introduced for the proper and logically relevant purpose of showing that the person who abused the infant did so intentionally. First-degree child abuse, the predicate felony used in this case, is defined as "serious physical or serious mental harm to a child" that is caused "knowingly or intentionally."[101] This statutory language made establishing intent a proper and logically relevant purpose for introducing the evidence.

In reaching this conclusion, we do not discount the fact that the evidence failed to establish that Knox committed all this past abuse. However, when "offered to show that certain injuries are a product of

---

[98] *Carines, supra* at 763.

[99] *Id.*

[100] See *Mills, supra* at 75.

[101] MCL 750.136b.

child abuse, rather than accident, evidence of prior
injuries is relevant even though it does not purport to
prove the identity of the person who might have
inflicted those injuries."[102] Moreover, there was some
testimony arguably connecting Knox to the abuse in
that Kelley testified that she found a bruise on the
baby's chest after Knox had been caring for him.
According to Kelley, she vigorously questioned Knox
about the bruise and discussed it with several people,
including the physician's assistant at her doctor's
office. Kelley apparently accepted the idea that the
baby's pacifier, which was clipped to a garment over
his chest, must have caused the bruise. The physi-
cian's assistant testified that she saw the bruise and
found no cause for alarm. One of the medical experts,
however, suggested that the baby would not have
received a bruise from lying on a pacifier. We see no
unfair prejudice that would substantially outweigh the
value of this evidence, which was probative of
whether the injuries the baby suffered were inflicted
intentionally.

### F. GOOD CHARACTER

In the case-in-chief, the prosecutor elicited exten-
sive details of Kelley's experience with children, her
knowledge of child rearing, her assets as a mother,
her love for her children, and her grief at learning of
the baby's death. Eight witnesses, including Kelley,
testified about her background and parenting skills.
The prosecutor argued that the testimony was logi-
cally relevant because Knox was accusing Kelley of

---

[102] *Estelle v McGuire*, 502 US 62, 68; 112 S Ct 475; 116 L Ed 2d 385
(1991).

the murder. However, the evidence of Kelley's mothering abilities, love for her children, and experience with children was arguably irrelevant to the prosecutor's case-in-chief.[103] Even if, as the prosecutor claims, this evidence was solely intended to rebut Knox's contention that Kelley abused the baby, it should have been presented after the defense, not in the prosecutor's case-in-chief.[104]

Even considering *Hine* and ignoring the error in the timing of this alleged rebuttal evidence, we conclude that this evidence was improper character evidence. MRE 404(a) provides that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion," except in certain circumstances. The exceptions involve the character of the accused, character of victims of homicide, and character of a victim's sexual conduct.[105] MRE 404(a)(4) specifically provides that character evidence related to witnesses is governed by MRE 607, 608, and 609. MRE 607 provides that any party may attack the credibility of a witness. MRE 608(a) limits opinion and reputation evidence to character for *truthfulness or untruthfulness* after the character of the witness has been attacked by opinion or reputation evidence. MRE 608(b) allows the trial court to admit evidence of specific instances of a witness's conduct to support the witness's credibility, but only if the instances concern the witness's character for

---

[103] See *People v Keskinen*, 177 Mich App 312, 320-321; 441 NW2d 79 (1989), citing *People v Duke*, 136 Mich App 798, 803; 357 NW2d 775 (1984).

[104] See *People v Rice (On Remand)*, 235 Mich App 429, 442; 597 NW2d 843 (1999).

[105] MRE 404(a)(1), (2), and (3).

truthfulness or untruthfulness. The prosecutor's evidence of Kelley's character had nothing to do with her truthfulness or untruthfulness. Further, MRE 609 does not apply to this situation because the court rule deals with impeachment by evidence of conviction of a crime.

In sum, the rules of evidence do not provide that the prosecution may preempt a defense that someone other than the defendant committed the crime by arguing that the person the defense blames was "too good" to have committed the crime. Additionally, the evidence of Kelley's good character was improper under MRE 404(b), because it did not serve one of the noncharacter purposes articulated in that rule. This evidence was used to demonstrate that Kelley acted in conformity with her good character on the night of the incident, in contrast to Knox's alleged bad character, and thus that Knox's defense should not be believed. Therefore, we conclude, even in light of *Hine*, that Knox has demonstrated that it was plain error for the trial court to admit the evidence that Kelley was a good, loving parent who could not have committed the crime.

Demonstrating plain error with respect to this "prior-good-acts" character evidence is, however, not the only burden that Knox faces. Determining that the trial court plainly erred does not, alone, justify reversing a criminal conviction.[106] Rather, we must decide whether the plain error in admitting this evidence prejudiced Knox's substantial rights, affecting the outcome of the trial-court proceedings.[107] Knox argues

---

[106] See *Carines, supra* at 763.

[107] *Id.*

that this error was, in fact, outcome-determinative because the evidence amounted to nothing more than a direct credibility contest between him and Kelley concerning who injured the baby. He concedes that he was the last person alone with the baby, but notes that the medical evidence allowed the possibility that Kelley injured the baby before she left the apartment.

This case may very well have been essentially a credibility contest over which parent—both of whom had access to the baby near in time to his death—inflicted the fatal injuries. However, the evidence concerning Kelley's mothering abilities was not decisive. The prosecutor had a reasonable likelihood of convicting Knox by demonstrating that he was alone with the baby when the baby sustained the fatal injuries. Thus, we conclude that Knox has not satisfied his burden of showing that this evidence affected his substantial rights.[108] Therefore, he is not entitled to relief.

### G. INEFFECTIVE ASSISTANCE OF COUNSEL

In an argument related to his challenge to all these pieces of evidence, Knox also contends that his trial attorney was ineffective for failing to object. However, to win a new trial on the basis of the denial of effective assistance of counsel, "a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced the defendant as to deprive him of a fair trial."[109] The foregoing analysis indicates to us that, even assuming it was error to admit this evidence, the error was insufficiently prejudicial to

---

[108] See *People v Ullah*, 216 Mich App 669, 676; 550 NW2d 568 (1996).

[109] *People v Pickens*, 446 Mich 298, 338; 521 NW2d 797 (1994).

"justif[y] reversal of an otherwise valid conviction
. . . ."[110]

### IV. DUAL CRIMES

Referring to the language in the felony-murder statute, Knox challenges "whether a defendant can be said to have committed one crime while 'in the perpetration of' another when the same acts themselves constitute both the murder and the predicate felony." Stated another way, Knox contends that the Legislature, in enacting the felony-murder statute, did not intend to elevate to first-degree murder every death of a child resulting from abuse. Consequently, he frames this issue as a question of insufficient evidence of the intent that would otherwise be necessary to prove that he committed first-degree murder.

However, this Court recently considered this issue in *People v Magyar*.[111] In *Magyar*, as in this case, the defendant was convicted of first-degree felony murder with first-degree child abuse as the underlying felony.[112] The defendant argued that the conviction was improper because the murder and predicate felony both arose out of the same act, a blow to the young victim's skull.[113] In the defendant's view, there must be "two distinct crimes," so that "felony murder applies only where a second-degree murder is committed in the perpetration of one of the enumerated felonies in the statute."[114] This Court disagreed, rea-

---

[110] *Id.*

[111] *People v Magyar*, 250 Mich App 408; 648 NW2d 215 (2002).

[112] *Id.* at 410.

[113] *Id.*

[114] *Id.*

soning that, because the jury found that the defendant possessed both the malice to commit murder and the intent necessary to commit first-degree child abuse, the defendant's argument was without merit.[115] Further, this Court indicated, "Michigan's felony-murder statute serves to raise an established murder to first-degree murder and 'makes no distinctions for the commission of enumerated felonies with assaultive intent against the murder victim.' "[116]

Though Knox also made a related vagueness argument, he failed to present that issue in the statement of questions presented[117] and did not brief it adequately.[118] Accordingly, we do not address this related constitutional issue.

Affirmed.

TALBOT, J., concurred.

BANDSTRA, J. (*concurring in part and dissenting in part*). I disagree with the majority's conclusion that, under *People v Hine*, 467 Mich 242; 650 NW2d 659 (2002), the prior-bad-acts evidence here was admissible. I also disagree with the majority's more general conclusion that "*Hine* presents a formidable obstacle to reversing on the basis of a trial court's error in admitting prior-bad-acts evidence." *Ante* at 188. The prior-bad-acts evidence here should have been excluded under *Hine* and its predecessors. Applying a "plain error" analysis, I further conclude that defendant's conviction should be reversed.

---

[115] *Id.* at 412-413.

[116] *Id.*, quoting *People v Jones*, 209 Mich App 212, 215; 530 NW2d 128 (1995).

[117] See *People v Miller*, 238 Mich App 168, 172; 604 NW2d 781 (1999).

[118] *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).

A. *HINE*

The majority correctly summarizes recent pre-*Hine* Supreme Court precedents, including *People v VanderVliet*, 444 Mich 52; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994), *People v Crawford*, 458 Mich 376; 582 NW2d 785 (1998), and *People v Sabin (After Remand)*, 463 Mich 43; 614 NW2d 888 (2000). *Ante* at 182-185. Under those precedents, to be admissible, evidence of prior bad acts " 'truly must be probative of something *other* than the defendant's propensity to commit the crime.' " *Ante* at 183, quoting *Crawford, supra* at 390 (emphasis in original).

*Hine* did nothing to undermine these precedents or this analysis.[1] Instead, *Hine* was a fact-specific application[2] of the rule that prior-bad-acts evidence that is probative of something other than propensity is admissible. Specifically, the Supreme Court held "that the evidence was admissible to establish the common scheme, plan, or system of the defendant in perpetrating a *particular* type of physical assault." *Hine, supra* at 244 (emphasis added). That holding was consistent with the Court's reasoning that the injuries to the child victim (internal abdominal injuries/bruising and a bruise across the bridge of the nose) and the cause of her death (multiple blunt-force injuries) were "typical of" or "similar to" the injuries

---

[1] If *Hine* was the radical departure from previous case law that the majority makes it out to be, it no doubt would have resulted in at least one dissenting or concurring opinion. The fact that no such opinion issued supports my conclusions regarding *Hine* as falling in line with previous decisions of the Supreme Court.

[2] I might agree with the majority if its only conclusion was that *Hine* had misapplied the rule to the facts in that case. Such a misapplication, however, would not undermine the rule, which, as demonstrated below, remains intact.

resulting from the assaults described in the other-bad-acts evidence (regarding the defendant's methods of "head-butting," forcefully kneeing and poking, and "fishhook" assaulting the witnesses). *Id.* at 244-253.

In so concluding, the Supreme Court disagreed with our Court's "view of the evidence" and resulting conclusion that "the degree of similarity between the other acts evidence and the charged conduct" was insufficiently established. See *id.* at 251, 253. Citing *Sabin*, the Court reasoned that "[t]he evidence of uncharged acts needs only to support the inference that the defendant employed the common plan in committing the charged offense" and that "[t]he trial court operated within the correct legal framework in determining the evidence admissible under *Sabin*." *Id.* at 253.

In addition to this direct and uncritical reliance on *Sabin*, the Supreme Court also cited with apparent approval the lower courts' reliance on *VanderVliet* and *Crawford. Id.* at 247, 249. I thus conclude that these precedents continue to provide binding guidance to us in analyzing the issue presented here.[3]

---

[3] My primary concern is the majority's conclusion that *Hine* represents a radical departure from its predecessors. In addition, I do not share the majority's view that the Supreme Court broadened the rule requiring an appellate court to consider evidence in a light most favorable to the prosecutor by applying it to the prior-bad-acts-evidence question. Although *Hine* is not crystal clear in this regard, it seems, instead, that the Supreme Court's concern was that our Court's analysis in *Hine* was based on an erroneous conclusion that the evidence presented was insufficient to support the conviction, which resulted from the failure to use the "light most favorable" analysis. See *id.* at 250 (the Supreme Court concluded that our Court "erred" in stating "that there was 'precious little evidence that there was a criminal act' "), and 252 ("the Court of Appeals imposed a standard of a high degree of similarity between the other acts and the charged acts, apparently because it believed that the evidence presented to the trial court did not demonstrate any unlawful conduct"). Further, I find no import whatsoever in the Supreme Court's failure to consider whether the

Applying these precedents here, the other-bad-acts evidence was improperly admitted.

### B. ANGER

On appeal, the prosecutor has not, even at oral arguments, articulated a proper purpose for the evidence concerning Knox's anger. *Crawford, supra* at 390. Neither has the prosecutor argued how that evidence was logically relevant to a material issue at trial. *Id.* Rather, the prosecutor emphasizes that this evidence was only a "minor aspect" of the trial. This is tantamount to a tacit admission by the prosecutor that there was no legitimate basis to admit this evidence. Even though I have independently reviewed the evidence to determine whether the trial court erred in admitting it, these flaws in the prosecutor's arguments only make more compelling Knox's contentions that his anger, including his argumentative relationship with Kelley,[4] was not logically relevant to any fact at issue at trial.

In actuality, the logical relevance of the evidence that Knox has an anger problem is nonexistent. This is not a case like *Hine*; defendant's previous bursts of anger resulted in no act of any similarity whatsoever to that which killed the baby. Further, the record provides no basis to suggest that Knox was ever angry with the baby, or that he ever redirected his anger at

unfair prejudice of admitting the evidence outweighed its probative value under MRE 403. See *ante* at 191. That issue was apparently not part of the appeal, although it may have been among the "remaining arguments" of the defendant that were to be considered on remand. See *Hine, supra* at 253.

[4] Although the majority suggests that the evidence showed that Knox had been physically abusive to Kelley, the record only establishes one incident involving shoving.

Kelley to the baby or Kelley's other child. The witnesses at trial, including Kelley, all indicated that Knox was ecstatic at the baby's birth.

This prior-bad-acts evidence served the distinctly improper purpose of demonstrating that Knox must have abused the baby, resulting in the baby's death, because he had a bad character. See MRE 404(a). Indeed, at trial, the prosecutor specifically argued that Knox's anger-management problem was a plausible explanation for what happened to the baby on the night in question. The prosecutor did not use the evidence of Knox's anger for *any* other reason except to make this impermissible propensity argument. Accordingly, Knox has demonstrated that the trial court committed plain error when it admitted the evidence of his anger problems. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

### C. PAST ABUSE

The majority concludes that the evidence that the baby had previously been abused was relevant to prove that the fatal injuries were not inflicted accidentally, a purpose that MRE 404(b) endorses as proper. I agree.

However, this was not the only purpose that the prosecutor advanced with this evidence. As pointed out by the majority, the prosecutor introduced evidence to convince the jury not only that the prior events were intentionally abusive but also that defendant was the abuser. Beyond the evidence described by the majority, I also note that the prosecutor stressed this theme in its closing argument to the jury. This case is thus like *Washington v Hofbauer*, 228

F3d 689 (CA 6, 2000), cited by defendant. There, evidence regarding the defendant's character "was admissible for certain limited purposes, [but] the prosecutor went far beyond the bounds of permitted conduct when presenting that evidence to the jury." *Id.* at 699. Specifically, "the prosecutor improperly implied that the jurors should consider [the defendant's] unseemly character when rendering their verdict . . . ." *Id.* Characterizing the case as "a close credibility contest . . . , with horrible acts alleged but scant hard evidence for the jury to weigh," the court reasoned that "a prosecutor must be doubly careful to stay within the bounds of proper conduct." *Id.* at 709. As a result of the erroneous use of the otherwise admissible evidence and other errors, the court reversed the defendant's conviction. *Id.*

Knox has again demonstrated that the trial court committed plain error in failing to prevent the prosecutor from improperly using the evidence of prior abuse. *Carines, supra.* As in *Washington*, this was a close credibility contest with little hard evidence and the prosecutor improperly sought to establish Knox's bad character rather than risk an acquittal as a result of the slim evidence of his guilt.

### D. GOOD CHARACTER

I agree with the majority's conclusion that it was plain error[5] to allow the evidence of Kelley's good character to be considered by the fact-finder. *Ante* at 198-201. This evidence was improperly admitted

---

[5] Defense counsel did raise a general relevancy objection to this evidence without specifically referencing the rules governing character evidence.

because it did not serve any of the character pur-
poses allowed by the court rules. *Ante* at 199. This
evidence was used only to demonstrate that Kelley
acted in conformity with her good character on the
night of the incident, in contrast to Knox's acting in
conformity with his bad character. This evidence
improperly undermined defendant's credibility and
defense.

### E. SUBSTANTIAL RIGHTS AND OUTCOME

Knox argues that the plain errors in admitting the
evidence of his prior bad acts and Kelley's good char-
acter were, in fact, outcome-determinative. See
*Carines, supra.* He contends that the evidence
amounted to nothing more than a direct credibility
contest between himself and Kelley concerning who
injured the baby. He concedes that he was the last
person alone with the baby, but argues that the medi-
cal evidence allowed the possibility that Kelley
injured the baby before she left the apartment.

I agree. Setting aside the improper evidence of
Knox's anger-management problems, the baby's his-
tory of injuries, and Kelley's good character, there is
virtually no weight to the prosecutor's case; I note
that Knox's first trial in this case resulted in a hung
jury. The only proper testimony that was damaging to
Knox was that he had difficulty bonding with the
baby, which frustrated him. However, Kelley and all
the other prosecution witnesses testified that they
never saw Knox harm the baby. Kelley also said that
she never suspected Knox was abusing the baby.
Moreover, the time line did not positively implicate
Knox as the *only* person who could have inflicted the
fatal injuries. Kelley left the apartment on the night in

question around 9:30 P.M. or 9:35 P.M. By 10:00 P.M., Kelley's mother received a telephone call that there was something wrong with the baby. Further, there was testimony that 911 was called between 10:05 P.M. and 10:13 P.M. At trial, one of the medical experts testified that, within a minute or two of suffering the injuries, the baby probably would have lost consciousness and may have vomited or had seizures. Abnormal respiratory problems would arise very rapidly but could stabilize in an abnormal pattern for "an hour to two hours before the child totally collapses without breathing and without heart rate." If the baby consumed a bottle at 9:00 P.M., the expert indicated that the injury was inflicted somewhere between the time the bottle was given and the time the paramedics were called. Both parents were in the home during this time frame.

Given this testimony, the trial was essentially a credibility contest regarding which parent, both of whom had access to the baby, inflicted the injuries. Without the damning evidence of Knox's unrelated behavior and the baby's past injuries, and the positive evidence of Kelley's mothering abilities, the prosecutor had no reasonable likelihood of convicting Knox. Knox has demonstrated that this evidence was not harmless, and that it affected the outcome of the trial. See *People v Ullah*, 216 Mich App 669, 676; 550 NW2d 568 (1996). I further conclude that there is merit in Knox's claim that he was denied the effective assistance of counsel when there was no objection raised regarding the improper evidence. See *People v Stanaway*, 446 Mich 643, 687-688; 521 NW2d 557 (1994).

I would reverse Knox's conviction and remand for a new trial. Of course, I am shocked and saddened by the horrible circumstances of this baby's short and painful life. However, the conviction resulting from the trial court's plainly erroneous decision to admit this evidence cannot be properly affirmed. To do so would affect the integrity of the courts, calling into question the fairness of a system that allowed a jury to convict Knox on the basis of this improper evidence.[6] See *Carines, supra* at 763-764.

---

[6] I concur with the majority regarding its "dual crimes" analysis. *Ante* at 202.