# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KEITH ARTHUR THIBEAULT,

        Defendant-Appellant.

UNPUBLISHED
February 26, 2015

No. 318216
Ionia Circuit Court
LC No. 2012-015595-FC

Before: BECKERING, P.J., and BORRELLO and GLEICHER, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of first-degree child abuse, MCL 750.136b(2), and first-degree felony murder predicated on first-degree child abuse, MCL 750.316(1)(b). The trial court sentenced defendant to life imprisonment for the murder conviction and 7 years' and 11 months to 15 years' imprisonment for the child abuse conviction. Defendant appeals his convictions as of right. For the reasons set forth in this opinion, we affirm.

## A. FACTS

This case arises from the death of defendant's three-month old son. The prosecution presented evidence that the victim's mother left the victim and his twin brother with a babysitter early one evening. The babysitter testified that both children were "very awake and alert" while she had them and that defendant picked the twins up a few hours later and took them home. Defendant had exclusive custody of the twins from the time he picked them up at the babysitter's until the time he called 9-1-1 early the following morning. First responders testified that the victim was limp, pale, and lacked a pulse upon arrival at defendant's house. One described the infant at the time as "very cold . . . and . . . blue," and stated "too cold for that to have just happened." The victim was taken to the hospital, where after several hours of attempts to revive him, he was removed from life support.

Several witnesses testified that defendant stated that he had the victim and his brother stationed on a couch for feeding, and that while he was attending to the brother, the victim fell to the floor. According to the witnesses, defendant maintained that the victim seemed unharmed at first, but later started crying, then stopped breathing. Defendant testified in his own defense, denying that he intentionally injured the victim or put the victim in danger in any way. Invited

-1-

on cross-examination to confirm that he had "no idea" how the victim suffered his fatal injuries, defendant replied, "The only thing that happened was that he fell off of the couch. That's the only thing that I know of that could have that kind of injuries."

At trial, Dr. Gioria Adam, an ophthalmologist called to the hospital to assist in treating the victim, testified as follows:

> I didn't need to dilate [the victim's] pupil[s] because of his severe situation of his brain. His pupil[s] were already naturally dilated. That's a bad sign. In fact, I asked them to get his admitting doctor. I say, this pupils [sic] are wide, dilated, don't react to light. Translated to plain English, he's in a very severe state, possibly brain dead.

Dr. Adam testified that the child exhibited no external injuries, but had "hemorrhages . . . all over the retina." Dr. Adam described the case as an "extreme" one, and further detailed finding "retinal edema, which is swollen retina." He testified that such injuries normally resulted from child abuse, and added that an authoritative study concluded that "the incidents of retinal hemorrhages, brain hemorrhage, and brain dysfunction, in absence of external head injury is 100% of abuse."

Dr. Stephen Guertin, Director of Sparrow Hospital's Children's Center and Pediatric Intensive Care Unit, testified that he treated the victim on March 24 and 25, 2012. Dr. Guertin testified that the victim had a "healing rib fracture probably two to four weeks old," and stated, "if you don't have metabolic disease and you've not suffered literally like, a car accident type injury with direct impact, that kind of injury, to the back of your ribs, there is nothing else that causes that other than abuse, in this age group." Dr. Guertin opined that the victim's injuries were not consistent with a fall from a couch onto a carpeted surface and he confirmed that the victim had extensive retinal hemorrhaging. He stated "the diffuse nature of this is seen in high velocity motor vehicle accidents which we know didn't happen, or in kids who get their heads crushed, which we know didn't happen, or in child abuse." Dr. Guertin further testified that concerns about child abuse led to examination of the victim's twin brother, which revealed a leg fracture that was "specific for abuse in this age group."

Dr. John Bechinski testified that he performed an autopsy on the victim, and he summarized some of his findings as follows:

> [T]here was swelling of the brain. There were bilateral subdural hematomas . . . . There were also patchy subarachnoid hemorrhages on the brain which is bleeding right on the surface of the brain. There was also bleeding within the eyeballs, in the retinas of the eyes and bleeding of the optic nerve sheath which is the outer covering of the optic nerve. The optic nerve runs from the back of the eyeball directly into the brain and there was evidence of bleeding on that as well.

Dr. Bechinski further testified that the lack of external injuries indicated that the serious internal injuries could have resulted from hard shaking, perhaps shaken baby syndrome, or from head impacts on a relatively soft surface such as a mattress or couch cushion, but not from a fall of a

short distance.  Dr. Bechinski additionally confirmed that the victim had a rib fracture that predated the fatal injuries and was "consistent with child abuse until proven otherwise."  Dr. Bechinski concluded that the cause of the victim's death was inflicted head trauma and the manner of death was homicide.

Dr. Rudolph Castellani, a neuropathologist at the University of Maryland School of Medical, testified that he examined tissue samples from the victim's brain and eyes.  Dr. Castellani testified that his examination revealed severe injuries, and that "[s]ubdural hemorrhage and extensive retinal hemorrhages in this age group are by far, by far most commonly encountered in inflicted or abusive injuries."

Defendant presented medical experts in his defense.  Dr. John Plunkett, a general and forensic pathologist, testified that he reviewed the victim's medical record and the victim's autopsy report.  Dr. Plunkett testified that the victim "died as a complication or consequence of an expanding, chronic subdural hematoma.  He had an established brain injury on March 24 and something happened to cause him to crash and have a cardiopulmonary arrest and that was the ultimate cause of his death."  Dr. Plunkett disagreed with Dr. Guertin that a fall from a couch could not cause a subdural hematoma and he disputed that retinal hemorrhages could help determine the cause of an injury.

Dr. Steven Abern, a pediatric neurologist, reviewed the victim's case file.  Dr. Abern opined that the victim had both chronic and acute subdural hemorrhaging.  He testified that the victim's hemoglobin level was lower than normal which was indicative of a blood clot.  Dr. Abern testified that the victim suffered an acute subdural hematoma after he fell from the couch.

Following defendant's testimony, the prosecutor called Dr. Carl Schmidt as a rebuttal witness.  Dr. Schmidt testified that he is a forensic pathologist employed as the Chief Medical Examiner for Wayne County.  Dr. Schmidt testified that he reviewed the victim's reports including the autopsy report and the reports of defendant's expert witnesses.  Dr. Schmidt testified that it was his opinion that the victim's cause of death was abusive head trauma and the manner of death was homicide.  Dr. Guertin was recalled as a rebuttal witness and he testified that he reviewed Dr. Abern's and Dr. Plunkett's reports and disputed the accuracy of the reports.

Defendant was convicted and sentenced as set forth above.  He appeals as of right.

B.  ANALYSIS

I.  SUFFICIENCY OF THE EVIDENCE

Defendant argues that there was insufficient evidence to show that he knowingly or intentionally caused serious physical harm to the victim and there was no evidence to show that he intended to harm the victim.  When reviewing the sufficiency of evidence in a criminal case, a reviewing court must view the evidence of record in the light most favorable to the prosecution to determine whether a rational trier of fact could find that each element of the crime was proved beyond a reasonable doubt. *People v Herndon*, 246 Mich App 371, 415; 633 NW2d 376 (2001).  Review is de novo. *Id.*

Defendant was convicted of first-degree child abuse and his felony murder conviction was predicated on that offense. MCL 750.136b(2) provides: "[a] person is guilty of child abuse in the first-degree if the person knowingly or intentionally causes serious physical or serious mental harm to a child." The elements of first-degree felony murder include: "(1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result . . . (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [MCL 750.316(1)(b), here first-degree child abuse]." *People v Smith*, 478 Mich 292, 318-319; 733 NW2d 351 (2007) (quotation marks and citations omitted). Defendant contends that there was insufficient evidence to show that he knowingly or intentionally caused harm to the victim as required under MCL 750.136b(2).

In this case, viewed in a light most favorable to the prosecution, there was sufficient evidence to allow a rational jury to conclude beyond a reasonable doubt that defendant knowingly or intentionally caused serious physical harm to the victim. Here, evidence showed that, at the time the victim suffered his fatal injuries, he was in defendant's exclusive custody. Testimony showed that, immediately before defendant took the victim into his custody, the victim was active and alert with the babysitter. The prosecution presented expert witnesses who disputed defendant's assertion that the victim suffered his injuries following a fall from a couch. Instead, several experts testified that the victim's injuries were caused by abuse, which supported the prosecution's theory that defendant intentionally inflicted fatal injuries upon the victim. Specifically, Dr. Adam testified that the victim suffered retinal hemorrhaging, which normally resulted from child abuse. Dr. Guertin testified that the victim's injuries were not consistent with a fall from a couch, and that the injuries were normally associated with either a high-velocity car accident, which had not occurred, or child abuse. Dr. Bechinski testified that the victim's extensive internal injuries could have resulted from hard shaking and Dr. Castellani testified that the victim's severe injuries were "by far, by far most commonly encountered in inflicted or abusive injuries." Finally, Dr. Schmidt testified that the cause of death was abusive head trauma and the manner of death was homicide.

On this record, a rational jury could have concluded beyond a reasonable doubt that defendant intentionally or knowingly inflicted serious injury upon the victim. Although defendant offered expert testimony to rebut the prosecution's experts, and although defendant testified that he did not harm the victim, issues involving the credibility of witnesses and weight accorded the evidence are matters for the jury to resolve. *People v Stiller*, 242 Mich App 38, 42; 617 NW2d 697 (2000). Furthermore, to the extent defendant argues that there was no direct evidence to show that he intentionally or knowingly inflicted a serious injury upon the victim, the prosecution is not required to offer direct evidence; instead, "[c]ircumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove the elements of a crime." *People v Jolly*, 442 Mich 458, 466; 502 NW2d 177 (1993). Here, the prosecution introduced a significant amount of circumstantial evidence that would allow a rational jury to conclude beyond a reasonable doubt that defendant committed the charged offenses.

Concerning defendant's intent, defendant too hastily characterizes first-degree child abuse as a specific-intent offense.[1] Our Supreme Court has held that it is unnecessary to distinguish between specific and general intent for purposes of prosecuting that crime. *People v Maynor*, 470 Mich 289, 296; 683 NW2d 565 (2004). Instead, it is sufficient that the jury be instructed that the prosecution must prove that the defendant intended to commit the act that resulted in harm, and in doing so "intended to cause serious physical harm or . . . knew that serious physical harm would be caused." *Id.* at 297. In this case, the trial court instructed the jury that the prosecution had to prove that "defendant either knowingly or intentionally caused serious physical harm" to the victim. The words "knowingly or intentionally" mirror the applicable statute, MCL 750.136b(2), and comport with *Maynor*, 470 Mich at 297. Accordingly, the prosecution was obligated to prove that defendant engaged in conduct that caused the victim serious physical harm, and did so either intending that the harm would result from his actions, or, alternatively, with knowledge that serious physical harm would result, whether or not he actually desired that result.

"An actor's intent may be inferred from all of the facts and circumstances . . . and because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient." *People v Fetterley*, 229 Mich App 511, 517-518; 583 NW2d 199 (1998) (citations omitted). Here, evidence that the victim sustained his injuries while in defendant's exclusive custody combined with the testimony of the prosecution's expert witnesses discussed above was sufficient to allow a rational jury to conclude beyond a reasonable doubt that defendant caused severe physical harm and acted with intent or knowledge that serious injury would result from his actions.

In sum, there was sufficient evidence to support defendant's convictions in this case.

## II. EVIDENCE OF PRIOR INJURIES

Defendant argues that the trial court erred in admitting evidence that both the victim and his brother suffered prior injuries that suggested abuse. Defendant preserved this issue for review by objecting to the evidence prior to its admission. *People v Dupree*, 486 Mich 693, 703; 788 NW2d 399 (2010).

We review a trial court's evidentiary decisions for an abuse of discretion. *People v Martzke*, 251 Mich App 282, 286; 651 NW2d 490 (2002). A trial court abuses its discretion when it reaches a result that falls outside the range of reasonable and principled outcomes. *People v Kahley*, 277 Mich App 182, 184; 744 NW2d 194 (2008). "[A] preserved, nonconstitutional error is not a ground for reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999).

---

[1] "A statute that requires a prosecutor to prove that the defendant intended to perform the criminal act creates a general intent crime. A statute that requires proof that the defendant had a particular criminal intent beyond the act done creates a specific intent crime." *Herndon*, 246 Mich App at 385.

Evidence of the character of an accused is generally prohibited pursuant to MRE 404(a). However, under some circumstances evidence of a person's other "crimes, wrongs, or acts" is admissible for non-character purposes pursuant to MRE 404(b)(1). In the event that the prosecution intends to introduce other-acts evidence, MRE 404(b)(2) requires the prosecutor to provide the defense with pretrial notice of its intent to introduce the evidence.

In this case, before opening statements, defense counsel objected to any presentation of evidence that the victim previously suffered a broken rib or that the victim's brother suffered a fractured leg bone on grounds that the prosecution did not provide any notice of intent to introduce MRE 404(b) evidence. The prosecuting attorney responded that he wished to make issue of the broken rib, and possibly the broken leg, not to characterize them as prior bad acts, but as part of "the basis of one of the expert's opinion . . . that this was an abusive case, that it was inflicted head trauma," citing MRE 702, MRE 703, and MRE 704. The prosecuting attorney elaborated that there would be no attempt to impute those earlier fractures to defendant's conduct, "only that they exist and they help this expert formulate his conclusion."

Defense counsel continued to protest that the evidence would "inflame" the jury, because it was being used "to show that . . . [the children] [were] abused prior because Dr. Guertin will say that both . . . are pathognomonic for abuse . . . and he's made the conclusion that [defendant] is the one who did those. But there's zero evidence that ties [defendant] to either one of those injuries." Defense counsel added, "there is no relevance in this case other than to say that [defendant] caused those injuries as well and that the kids were abused in the past," which would cause the jury "to jump to the conclusion that it's [defendant] that was abusing these children over months and that clearly is not relevant . . . and there's no evidence . . . that [defendant] had anything to do with those other injuries." The trial court then asked the attorneys not to mention anything of the earlier fractures until the issue could be more fully addressed.

After opening statements, the argument resumed, with the prosecuting attorney reiterating that he was offering the evidence not as prior bad acts, but as part of the basis for expert opinion, characterizing the evidence as "strictly factual information" and "not character based," and adding that "Dr. Guertin . . . has to be allowed to communicate to the jury[] everything that went into his opinion." Defense counsel in turn persisted, "They're not relevant . . . [i]f we don't know who committed the prior acts." The trial court regarded the issue as presenting "a very close call," but held that the expert's testimony "will be limited to show only that it was in his opinion, not accidental in terms of this prior act and how that impacts the circumstances before this Court," and offered to provide the jury with a limiting instruction.

As noted above, Dr. Bechinski testified that his autopsy brought to light a rib fracture that must have predated the fatal injuries, and opined that the fracture was of a kind strongly indicative of child abuse. Additionally, Dr. Guertin described discovering a "healing rib fracture" probably two to four weeks old, and stated, "if you don't have metabolic disease and you've not suffered literally like, a car accident type injury with direct impact, that kind of injury, to the back of your ribs, there is nothing else that causes that other than abuse, in this age group." Dr. Guertin further opined that the victim's injuries were not consistent with a fall from a couch onto a carpeted surface, and that the extent of such injuries as were at issue in this case "is seen in high velocity motor vehicle accidents which we know didn't happen, or in kids who get their heads crushed, which we know didn't happen, or in child abuse." Dr. Guertin

additionally described discovering evidence of a broken leg bone in the victim's twin brother, and stated that the break was of a kind he regarded as "specific for abuse in this age group."

In this case, the trial court agreed with the prosecution that the evidence in question did not cover bad acts for purposes of MRE 404(b), but rather helped explain the basis for expert testimony that the injuries at issue were intentionally inflicted, not the result of accident.

MRE 703 states that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence." However, introduction of evidence relating to "the particular case upon which an expert bases an opinion or inference" under MRE 703 must be independently admissible under the rules of evidence. See *People v Yost*, 278 Mich App 341, 388-390; 749 NW2d 753 (2008). Accordingly, if the evidence the prosecution wishes to admit under MRE 703 is of a defendant's prior bad acts, that evidence remains to be subject to the substantive and procedural rigors of MRE 404(b).

Defendant argues that the prosecuting attorney's avoidance of MRE 404(b) by disclaiming the evidence of the twins' earlier injuries as bad acts, including by refraining from trying to prove or argue that defendant was responsible for them, effected "a 'back door' admission of prior bad act evidence."

The prosecution relies on this Court's statement in *People v Knox*, 256 Mich App 175; 662 NW2d 482 (2003), rev'd on other grounds 469 Mich 502 (2004), that "when 'offered to show that certain injuries are a product of child abuse, rather than accident, evidence of prior injuries is relevant even though it does not purport to prove the identity of the person who might have inflicted those injuries.'" *Id.* at 197-198 (WHITBECK, C.J., with TALBOT, J., concurring), quoting *Estelle v McGuire*, 502 US 62, 69; 112 S Ct 475; 116 L Ed 2d 385 (1991).

Our Supreme Court reversed this Court in *Knox*, on grounds including that the prosecution had attempted to attribute the earlier injuries to the defendant in the absence of any such evidence, and that the trial court improperly admitted evidence of the victim's mother's good character. *People v Knox*, 469 Mich 502, 513-514; 674 NW2d 366 (2004). The Court agreed with this Court, however, that "the signs of past physical abuse of the child were relevant to prove that his subsequent fatal injuries were not inflicted accidentally." *Id.* at 513.

In this case, evidence of the prior injuries to the victim's brother were not admissible to prove that the victim's subsequent fatal injuries were deliberately inflicted by defendant. Here, whether the brother suffered a prior injury had no bearing on the victim's injuries. The source of the injury was unknown and there was no evidence that the injury was in any way related to the victim's fatal injuries. Thus, evidence of that injury was not factual evidence that tended to establish grounds upon which the experts based their opinions and it should not have been admitted under MRE 703. However, defendant cannot show that "it is more probable than not that the error was outcome determinative." *Lukity*, 460 Mich at 496. Here, the evidence was limited and the prosecution did not attempt to link defendant to prior abuse. Instead, a Child Protective Services Worker (CPS) worker testified that, during a CPS investigation, defendant's wife accepted responsibility for the broken leg bone. In addition, the trial court provided the following limiting instruction to the jury at the end of the third day of trial, stating as follows:

Ordinarily when you hear evidence you can consider it for any reason you'd like in your deliberations. However, occasionally evidence comes in for a limited purpose. In this matter you have heard evidence of prior injuries to the children . . . and today you will hear evidence about those same injuries. *That evidence is being admitted and given to you only to help you understand the basis of the expert's opinions. The defendant is not on trial for those other prior acts so you can consider this testimony only for the limited basis of the experts' opinions.* [Emphasis added.]

This instruction served to minimize any potential prejudice. See *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998) ("jurors are presumed to follow their instructions"). Moreover, given the significant amount of other circumstantial evidence, including expert testimony concerning the extent of the victim's injuries and evidence that the victim suffered the injuries while in defendant's exclusive custody, evidence that the victim's brother had a prior abusive injury was not outcome-determinative. *Lukity*, 460 Mich at 496.

With respect to the victim's prior injuries, the trial court properly instructed the jury regarding the purpose of the evidence and the evidence was admissible under MRE 703 because it was critical factual evidence that contributed to the basis on which the prosecution experts grounded their opinions. See *Knox*, 469 Mich at 513-514. Here, the defense theory was that the victim suffered his injuries as a result of an accident, evidence of earlier injuries suggesting abuse was relevant to show that the injuries at issue were not the result of an accident. Moreover, the prosecution did not attempt to tie defendant to the earlier injuries. Indeed, in his appellate brief, in arguing that the evidence could not have been admitted under MRE 404(b)(1), defendant asserts that evidence of the past abuse "could not be considered a prior bad act of the Defendant, since there was no way to prove that he had caused those injuries." In addition, the court provided the above-referenced limiting instruction to the jury. See *Graves*, 458 Mich at 486 ("jurors are presumed to follow their instructions"). In sum, the trial court did not abuse its discretion in admitting evidence of the victim's prior injuries under MRE 703.

Defendant contends that the evidence should have been excluded under MRE 403 because its probative value was outweighed by the danger of unfair prejudice.

Relevant evidence may be excluded if "its probative value is *substantially* outweighed by the danger of *unfair* prejudice." MRE 403 (emphasis added). "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998).

In this case, evidence of prior abusive injuries was not merely "marginally probative." *Id*. The factual evidence was relevant to show part of the basis on which the prosecution's experts grounded their opinion. Whether the victim's injuries were accidental was critical in this case. Evidence of the prior injuries gave context to the experts' opinions that the injuries were not caused by accident, but instead were abusive in nature. The evidence therefore was highly relevant. *Id*. Moreover, there was minimal danger that the jury gave the evidence undue or preemptive weight. *Id*. As defendant concedes in his brief, there was no evidence directly linking defendant to the injuries. In addition, a CPS worker testified that defendant's wife accepted responsibility for the injury to the victim's brother and the trial court provided a

limiting instruction to the jury. In short, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

### III. JURY SELECTION

Defendant argues that, in conducting voir dire of the prospective jurors, the trial court failed to ask sufficiently probing questions to reveal grounds for challenging the jurors, or otherwise to allow defense counsel sufficient participation in the process. See MCR 6.412 (C)(1); *People v Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994) ("A defendant who chooses a jury trial has an absolute right to a fair and impartial jury.") (MALLETT, J., joined by CAVANAGH, C.J., and LEVIN, J.), citing *Duncan v Louisiana*, 391 US 145; 88 S Ct 1444; 20 L Ed 2d 491 (1968).

MCR 6.412 governs jury selection. Subrule (C)(1) notes that voir dire of prospective jurors "should be conducted for the purposes of discovering grounds for challenges for cause and of gaining knowledge to facilitate an intelligent exercise of peremptory challenges," and states that the scope of such procedure "is within the discretion of the court." Subrule (C)(2) in turn states that the "court may conduct the examination of prospective jurors or permit the lawyers to do so." However, "where the trial court, rather than the attorneys, conducts voir dire, the court abuses its discretion if it does not adequately question jurors regarding potential bias so that challenges for cause, or even peremptory challenges, can be intelligently exercised." *Tyburski*, 445 Mich at 619.

In this case, as defendant concedes on appeal, defense counsel expressed no objections to the procedure the trial court employed to ensure that the jurors selected would be fair and impartial. Instead, at the end of the selection procedure defense counsel stated, "Your Honor, the Defense is satisfied with the jury." Defense counsel's affirmative approval of the jury constitutes waiver of this issue because a criminal defendant may not assign error on appeal to something the defendant's own lawyer deemed proper at trial. *People v Carter*, 462 Mich 206, 214-216; 612 NW2d 144 (2000); *People v Barclay*, 208 Mich App 670, 673; 528 NW2d 842 (1995). Moreover, even if we were to review this issue, defendant has failed to show any error with respect to the jury selection process.

Defendant argues that the trial court failed to ask sufficiently probing questions to bring bias to light, specifying the lack of questioning about "juror's feelings on such topics as lying, child abuse, witness credibility and how people react in different ways to life altering events." However, defendant does not cite any authority for the proposition that prospective jurors must be queried on their attitudes toward lying and child abuse. Nor does defendant explain how any questioning of the jurors regarding witness credibility was necessary in light of the court's provision of standard instructions in that regard, or why engaging the jurors on the general subject of reacting to life-altering events would have been anything more than conversational.

Furthermore, the questions the trial court did ask the prospective jurors provided broad opportunity to discover bias. The court asked the prospective jurors about earlier jury service, personal knowledge about the case, familiarity with the witnesses, whether they had relatives or close friends who had been charged with, or victims of, similar crimes, and whether they had any association with law enforcement. The court further inquired about "religious, moral, or

philosophical beliefs" that would affect impartiality, and whether there would be any problem following the court's instructions. The court also asked whether the potential jurors had a child who had suffered injury that required hospitalization, or had close relationships with persons who had studied law or medicine.

Moreover, the court consistently invited the parties to issue challenges, and the single time defense counsel responded with a request for additional questioning, the court obliged, and the juror in question was ultimately excused for cause. Defendant points to no instance during jury selection where the trial court frustrated any action or other advocacy defense counsel sought to undertake.

In sum, the jury selection process did not deny defendant a fair trial. Furthermore, to the extent that defendant contends that trial counsel was ineffective for failing to raise an objection during the selection process, because defendant has failed to show that any error took place in the jury selection process employed, defense counsel's failure to object cannot constitute deficient performance. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) (declining to raise a futile objection, or otherwise advance a meritless position, does not constitute ineffective assistance of counsel).

## IV. PROSECUTORIAL MISCONDUCT

Defendant argues that the prosecutor improperly offered a civic-duty argument and denigrated the defense. Of the several instances of prosecutorial misconduct defendant alleges on appeal, two engendered defense objections, but defendant admits that the rest did not. This issue is thus preserved in some particulars, but not in others.

In deciding preserved issues of prosecutorial misconduct, this Court evaluates the prosecutor's comments in context to determine if the defendant was denied a fair and impartial trial. *People v Truong (After Remand)*, 218 Mich App 325, 336; 553 NW2d 692 (1996). However, unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting substantial rights. *People v Schutte*, 240 Mich App 713, 720; 613 NW2d 370 (2000), citing *People v Carines*, 460 Mich 750, 761-762; 597 NW2d 130 (1999). Reversal is appropriate only where "an objection could not have cured the error, or failure to review the issue would result in a miscarriage of justice." *People v Unger*, 278 Mich App 210, 234-235; 749 NW2d 272 (2008) (internal quotation marks and citation omitted).

During his opening statement, the prosecution argued as follows:

When this is all said and done we're going to come back and we're going to ask that you speak for your verdict, for [the victim]. He's not here to speak today. In fact, he's never going to speak again. We're going to ask that you come back and hold his father accountable for his actions . . . . That's what justice would demand. That's what justice would demand.

During rebuttal, the prosecutor stated: "You ask yourself when you go back there, how many incidents does a child get to have? How many did you have? How many did your children have? How many do your grandchild have, if you have grandchildren?"

Defendant did not object during the opening statement but did raise an objection during rebuttal, arguing that the prosecution was urging the jury to "decide the case based on emotion instead of the facts of the case." The trial court overruled the objection on the ground that it would be instructing the jurors on using their common sense, but asked "that we move forward and wrap this up," after which the prosecuting attorney moved on to another argument.

On appeal, defendant contends that the statements amounted to misconduct that denied him a fair trial.

A prosecuting attorney enjoys wide latitude in fashioning arguments, and may argue the evidence and all reasonable inferences from it. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). However, "Civic duty arguments are generally condemned because they inject issues into the trial that are broader than a defendant's guilt or innocence and because they encourage the jurors to suspend their own powers of judgment." *People v Potra*, 191 Mich App 503, 512; 479 NW2d 707 (1991).

The challenged comments from the opening statement, including the reminder that the young victim would "never speak again," did touch upon matters of some emotional sensitivity. However, the prosecuting attorney did not suggest in general terms that a serious crime against an infant warrants a conviction. Instead, the prosecuting attorney insisted that defendant should be held "accountable for his actions," thus keeping in view that the task at hand was determining defendant's responsibility for what happened, not simply avenging the victim. Further, the prosecutor preceded those comments by summarizing the evidence that would be presented, including that both sides would present experts, and telling the jurors that they would be deliberating on the basis of that evidence. The statement that justice demands a conviction thus was less an appeal to emotion than an admonishment not to shy away from the unpleasant duty of declaring a man guilty if the prosecution made its case. Moreover, improper civic-duty arguments may be cured where the trial court instructs the jury that arguments of counsel are not evidence. *People v Stimage*, 202 Mich App 28, 30; 507 NW2d 778 (1993). In this case, the trial court did so instruct the jury. Accordingly, the challenged portion of the prosecuting attorney's opening statement had minimal potential to persuade the jury to find defendant guilty simply out of sympathy for the victim.

Similarly, the prosecutor's statements during rebuttal argument did not amount to prejudice that denied defendant a fair trial. The reference to "incidents" to which children, or grandchildren, are exposed came in the context of reminding the jurors that children frequently suffer minor falls, with concomitant minor consequences. As the trial court noted at the time, this commentary anticipated its standard instruction to the jurors to "rely on your own common sense and everyday experience." This was not an appeal to emotion or otherwise an improper civic-duty argument, but rather an argument from the evidence that the short fall defendant described did not explain the serious injuries the victim suffered under defendant's care.

Defendant also argues that the prosecutor improperly denigrated the defense. Defendant contends that the prosecutor improperly emphasized that the defense experts were well paid for their time and testimony. In particular, during closing argument the prosecuting attorney stated about one defense expert, "If he wants to continue to make $100,000.00 a year for a part time gig, testifying about 18 times a year, well he's got to give an opinion where they'll hire him and

bring him into testify." The prosecutor characterized another defense expert as "another guy that likes litigation," and elaborated, "He testifies more for plaintiffs who sue doctors and hospitals and apparently makes a very good living doing that," and "if you don't give opinions that will cause the other side to pay you to come in, then that dries up." Then, during rebuttal, the prosecutor stated, "when you total that all up, those 3 experts, that is over $20,000.00 worth of bias in this case. Those 3 experts were worth over $20,000.00 worth of opinion that was bought . . . . It was bought. It was bought." Defense counsel objected to the latter comment on the ground that the prosecutor was attempting to inject considerations other than the pertinent facts, which the trial court impliedly sustained, stating, "Your objection is noted. I'm going to ask you to stick to the facts."

Defendant also argues that the prosecutor improperly accused defense counsel of misleading the jury and denigrated the defense on several occasions when the prosecutor claimed that defense counsel was utilizing a "squid defense." Specifically, during rebuttal, the prosecutor stated as follows:

> That's called the squid defense. If any of you know about squids in the ocean, when they are in trouble, when they are in danger, they drop their ink into the water and that ink muddies up the water, clouds up, and the squid swims away, away from the danger, and that's what this is about.

> * * *

> It's just what like I said earlier, there might be life on Mars but we don't know that. We can't say that it just didn't happen. It's possible but that's not what happened here. It's the squid defense.

> * * *

> I'm not going to reiterate it because you get the point. This is the squid defense. Don't focus on what [defendant] said and did. Focus on everything but, which [sic] I swim away.

The prosecutor referenced the "squid defense" on two separate occasions, including on one occasion where he referenced the defense experts and stated "its all things the defense experts don't address. Drop the ink and swim away." Defense counsel did not object to any of these remarks.

A prosecuting attorney "must refrain from denigrating a defendant with intemperate and prejudicial remarks." *Bahoda*, 448 Mich at 283. However, "[e]vidence that shows bias or prejudice on the part of a witness is always relevant . . . . Accordingly, testimony which touches the bias or interest of the witness is always admissible, and can be shown upon his cross-examination . . . ." *Powell v St John Hosp*, 241 Mich App 64, 72-73; 614 NW2d 666 (2000) (citations, internal quotation marks, and brackets omitted).

With respect to the prosecutor's argument concerning bias, defendant relies on *People v Tyson*, 423 Mich 357; 377 NW2d 738 (1985), wherein our Supreme Court reversed a criminal conviction in part because the prosecuting attorney belabored that the psychiatrist the defense

called in support of an insanity defense had been paid for his appearance. *Id.* at 373-377. However, in that case the prosecutor was not arguing from the evidence, but rather introduced the issue of the witness's being paid in the course of argument. *Id.* Further, as this Court noted in *People v Miller*, 182 Mich App 482; 453 NW2d 269 (1990), our Supreme Court reversed in *Tyson* partly because the prosecuting attorney's argument "was filled with innuendos, insults and ridicule." *Id.* at 486, citing *Tyson*, 423 Mich at 375.

In this case, the defense experts' respective compensation arrangements were in evidence. To the extent there were any innuendos to the effect that those experts had financial incentives to testify favorably to the defense, that was reasonable argument from the evidence. See *People v Chatfield*, 170 Mich App 831, 834; 428 NW2d 788 (1988) (holding that closing remarks pointing out that a defense expert was a "hired gun" did not merit reversal). Although the prosecutor argued forcibly in that regard, the commentary fell far short of the insults and ridicule of which *Tyson*, 423 Mich at 375, disapproved and "[a] prosecutor need not confine argument to the blandest of all possible terms." *People v Marji*, 180 Mich App 525, 538; 447 NW2d 835 (1989) (quotation marks omitted). Moreover, defense counsel made similar arguments concerning the prosecution's experts during his closing argument. In short, the prosecution's arguments concerning bias did not amount to misconduct that denied defendant a fair trial. *Truong*, 218 Mich App at 336.

With respect to the prosecutor's comments concerning a "squid defense," "[a] prosecutor may not suggest that defense counsel is intentionally attempting to mislead the jury . . . [h]owever, the prosecutor's comments must be considered in light of defense counsel's comments." *People v Watson*, 245 Mich App 572, 592-593; 629 NW2d 411 (2001). In this case, the prosecutor's remarks were made in rebuttal to defense counsel's closing argument. During his closing argument, defense counsel argued that there were multiple mistakes made by Dr. Guertin and the treating physicians in general. Defense counsel argued that there were inconsistencies between Dr. Guertin's testimony and testimony of another prosecution expert. Defense counsel cautioned the jury not to fall into the prosecutor's "trap." Viewed in context, the prosecutor's remarks about a "squid defense," essentially amounted to an argument that defense counsel was attempting to divert the jury's attention to minor inconsistencies rather than focusing on the evidence supporting defendant's guilt. The prosecutor did not suggest that defense counsel was deliberately lying and was instead responding to defense counsel's arguments. See *Watson*, 245 Mich App at 594 ("It was not improper for the prosecutor to respond by emphasizing the truth of the big picture, despite defense counsel's attempts to find discrepancies between the testimony of various witnesses.")

In sum, the prosecutor did not commit misconduct that denied defendant a fair trial. To the extent that defendant contends that counsel was ineffective for failing to raise objections during the prosecutor's arguments, because none of the challenged statements amounted to misconduct, defense counsel was not ineffective in this regard. *Ericksen*, 288 Mich App at 201.

Affirmed.

/s/ Jane M. Beckering
/s/ Stephen L. Borrello
/s/ Elizabeth L. Gleicher